UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:14-cr-00035-RLY-CMM |
| | ) | |
| LARRY TOMLINSON (01), | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION TO SUPPRESS**

Defendant, Larry Tomlinson, is charged by Indictment with: (1) possession of a firearm by a convicted felon, a violation of 18 U.S.C. § 922(g)(1); and (2) possession of a sawed off shotgun, a violation of 26 U.S.C. § 5861(d).  The charges stem from evidence seized during a traffic stop conducted in Evansville, Indiana.  Defendant now argues that the searches of his person and bag violated the Fourth Amendment because (a) law enforcement did not have a search warrant, (b) law enforcement did not have probable cause to arrest him or conduct a search, and (c) he did not consent to the searches.  As a result, Defendant maintains that any evidence seized during the traffic stop must be suppressed pursuant to the exclusionary rule.  For the reasons set forth below, the court **DENIES** Defendant's motion.

**I. Background**

On May 29, 2014, detectives with the Evansville-Vanderburgh County Drug Task Force received the following tip: a black male wearing a black shirt and red hat, staying in Room 214 at the Woodcreek Inn in Evansville, was dealing methamphetamine and in

possession of a firearm. Based on this tip, FBI Task Force Officer ("TFO") Mike Gray began surveilling Room 214 at approximately 1:45 p.m. TFO Gray informed Officer Lenny Reed, who was on duty near the Woodcreek Inn, that he had established surveillance. Around 2:15 p.m., TFO Gray witnessed a black male wearing a black shirt and red hat leave Room 214 carrying a black bag and enter the passenger side of a maroon Oldsmobile Aurora.

Because this individual matched the description from the tip, TFO Gray and Officer Reed began following the Aurora. While following the vehicle, the officers observed it turn right at a red light without first making a complete stop at the corner of Diamond and Kentucky Avenues. Officer Reed, who drives a marked patrol car equipped with a dash camera, activated his police lights and siren to stop the Aurora. The vehicle came to a stop at the corner of Stanley and Kentucky Avenues. The black male passenger observed at the hotel, later identified as Defendant, immediately exited the car. Officers observed a black bag in Defendant's hands as he stepped out of the vehicle. TFO Gray and Officer Reed ordered Defendant to sit back in the car at least four times, but Defendant did not comply. The officers then ordered him to show his hands, but he initially refused to do so. Defendant raised his left hand but kept his right hand low, around his waist level. On the dashcam footage, it is clear that Defendant was moving his right hand around, but it is difficult to discern what he was actually doing with that hand. The officers drew their firearms, pointed them at Defendant, and repeated the command. After being ordered to show his hands at least four times, Defendant finally

2

complied. The black bag that Defendant had in his hands was now at his feet, next to the Aurora.

The officers placed Defendant in handcuffs for their safety. Officer Reed conducted a pat down search of Defendant and asked for identification. Officer Reed then asked him if he would consent to a search of his person by saying, "Do you mind if I search your pockets?" Defendant responded either "Yes" or "Yeah, go ahead." Officer Reed found a bag of methamphetamine and a bag of marijuana in Defendant's pockets. He was then arrested and advised of his constitutional rights. When asked about the black bag sitting on the ground, Defendant claimed it was not his and that it was already there when the Aurora parked. The driver also denied owning the bag. TFO Gray then searched the bag in Defendant's presence. The search yielded a sawed off shotgun, digital scales, a box of sandwich bags, and a bag containing methamphetamine.

Defendant filed his Motion to Suppress on May 15, 2015, and the court held a hearing on May 17, 2016.

**II. Discussion**

Though counsel do not present the issues in this fashion, the court finds that Defendant's motion presents a series of six distinct legal questions that must be answered sequentially: (a) whether the informant was reliable; (b) whether the officers had reasonable suspicion to stop the Aurora; (c) whether the officers were justified in detaining Defendant; (d) whether Defendant consented to a search of his person; (e) whether the officers had probable cause to conduct a warrantless arrest of Defendant; and (f) whether Defendant has standing to challenge the search of the bag.

3

### A. Whether the informant was reliable

Defendant did not discuss the informant in his motion, but, at the hearing, counsel for Defendant attempted to challenge the informant's reliability by questioning the officer who received the tip. For the sake of completeness, the court briefly addresses this issue. Even if the court found the informant was not reliable, that fact would be irrelevant to the propriety of the stop because the officers did not stop the Aurora based on this tip. The undisputed testimony of the officers was that the reason for stopping the Aurora was a traffic violation. Therefore, the only basis for challenging the informant would be an argument that, because the tip came from an unreliable source, law enforcement was not justified in following Defendant's vehicle in the first place. If officers were not following him, they never would have witnessed the alleged traffic violation, or so the argument goes.

Unfortunately for Defendant, the Supreme Court foreclosed this argument long ago. *See United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."). Even if the officers were motivated to conduct the traffic stop because of the allegedly unreliable tip, that fact would have no effect on the court's analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("We think [our precedent] foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

**B. Whether the officers had reasonable suspicion to stop the Aurora**

Before police officers may lawfully conduct "a brief traffic stop," they "need at least reasonable suspicion to believe that the driver is breaking the law." *United States v. Flores*, 798 F.3d 645, 648 (7th Cir. 2015) (citing *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014)). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 134 S. Ct. at 1687 (quotation marks and citations omitted).

Here, it is undisputed that the driver of the Aurora failed to make a complete stop at a red light before making a right turn. Both officers testified that they witnessed the driver commit this violation, and Officer Reed opined that the violation is actually visible on the dashcam footage. The court reviewed the footage but was unable to see the violation. It appears that the Aurora has already made the turn by the time the intersection comes into view. Regardless, no one (such as the driver or a witness) testified that the car made a complete stop.

Indiana law provides, "Except when a sign is in place prohibiting a turn described in this subdivision, vehicular traffic facing a steady red signal, *after coming to a complete stop*, may cautiously enter the intersection to . . . [m]ake a right turn." Ind. Code § 9-21-3-7(b)(3)(B)(i) (emphasis added). A person who violates this statute commits a Class C infraction. Ind. Code § 9-21-3-11. With no evidence to rebut the officers' testimony, the court finds that the officers had reasonable suspicion to believe the driver had violated Indiana law.

### C. Whether the officers were justified in detaining Defendant

The officers testified that, after initiating the traffic stop, they detained Defendant for their safety. As a general rule, "[a]n officer may detain a suspect to preserve the safety of the officers, the suspect and the general public." *Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002). In the landmark case of *Terry v. Ohio*, the Supreme Court explained,

> [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

392 U.S. 1, 24 (1968). The Court went on to note, "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

Here, the officers were warranted in believing that they were in danger. After the Aurora came to a stop, Defendant immediately exited the vehicle. Officer Reed testified that this is unusual. Defendant then refused to get back into the car or show both of his hands, despite being repeatedly ordered to do so. The officers were acting on information that Defendant was in possession of a firearm and dealing methamphetamine. Thus, when Defendant refused to show his right hand, they could have reasonably believed that he was keeping his right arm down in order to grab a weapon. In fact, the dashcam

footage shows Defendant moving his right hand near his waistband. *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) ("Drug crimes are associated with dangerous and violent behavior and warrant a higher degree of precaution."). *Terry* plainly authorizes law enforcement to detain individuals under these circumstances.

### D. Whether Defendant consented to a search of his person

The Government argues that Defendant consented when Officer Reed asked if he could search his pockets. Defendant maintains that he did not give consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The court must therefore determine whether a reasonable person in Officer Reed's position would have understood that Defendant was consenting to a search. If he did consent, no search warrant was required: "Because a person may voluntarily waive his Fourth Amendment rights, no warrant is required where the defendant consents to a search." *United States v. Rahman*, 805 F.3d 822, 831 (7th Cir. 2015) (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

As noted above, Officer Reed asked Defendant, "Do you mind if I search your pockets?" Defendant's response on the dashcam footage is inaudible to the court, but Officer Reed testified that Defendant stated, "Yeah, go ahead." Seemingly he responded "Yes," because Officer Reed repeated that word, as if to clarify that is actually what Defendant stated. At the hearing, counsel for Defendant argued that Defendant only responded with the word "Yes," and, for purposes of this motion, the court assumes that

7

to be true. In responding, "Yes," Defendant was allegedly trying to convey that he did *not* consent to the search, as in, "Yes, I mind if you search my pockets." Officer Reed testified that he understood Defendant to be providing consent.

The Seventh Circuit faced a similar situation in *United States v. Price*, 54 F.3d 342 (7th Cir. 1995). In that case, an officer asked a driver for consent to search his car by saying, "Do you mind if I take a look?" *Id.* at 344. The driver responded, "Sure." *Id.* The district court found consent, and, on appeal, the driver argued that his response should have been interpreted as, "Sure, I mind if you take a look." *Id.* at 346. The Seventh Circuit remarked that, in the abstract, the driver's response was "ambiguous and thus capable of being interpreted as either 'Go ahead' or 'No way.'" *Id.* Despite the ambiguity, the court ultimately upheld the finding of consent:

> The only conclusion to be drawn from the totality of the evidence is that Pierce's immediate response "Sure" meant, "Sure, go ahead." The crucial fact is Pierce's failure to protest upon learning that Brown understood his response as a consent to the search. Had Pierce not agreed to the search, now was the time to make that clear. Yet when confronted with Brown's understanding of his response, Pierce offered no objection at all; instead, he submitted to a pat-down search and took a seat in Brown's patrol car in order to get out of the rain.

*Id.*

The Seventh Circuit discussed *Price* with approval in a more recent case, *United States v. Gonzalez-Ruiz*, 794 F.3d 832 (7th Cir. 2015). In *Gonzalez-Ruiz*, an officer asked the defendant, "Nothing in your car that I should be concerned about? Mind if I take a look?" *Id.* at 834. The defendant, who was on the phone with his wife at the time, stated, "I guess" and nodded in affirmation. The officer responded, "So we're good?" The

defendant did not reply. A second officer then directed the defendant toward the curb as the first officer began to search the vehicle. The defendant did not object when he saw the officer conducting the search. *Id.* On appeal, the defendant challenged the district court's finding of consent by arguing that when he said "I guess," he was actually responding to a question from his wife, not the officer asking for permission to search. *Id.* at 835. The defendant also pointed to the fact that the first officer asked, "So we're good?" as evidence that his response was ambiguous. Relying on *Price*, the Seventh Circuit rejected this argument: "To the extent that there was any residual ambiguity, it was eliminated when Laha began the search and Gonzalez-Ruiz did not object. . . . If Gonzalez-Ruiz did not intend to consent, Laha's commencement of the search 'was the time to make that clear.'" *Id.* at 836 (quoting *Price*, 54 F.3d at 346).

The Seventh Circuit's analysis in *Gonzalez-Ruiz* and *Price* is directly applicable here. The court finds that Defendant's answer to Officer Reed's question was ambiguous because a reasonable person could have understood Defendant to be communicating his consent or opposition to the search. The inquiry does not end there though. To paraphrase the *Price* court, the crucial fact is Defendant's failure to protest upon learning that Officer Reed understood his response as a consent to the search. 54 F.3d at 346. Like the defendants in *Gonzalez-Ruiz* and *Price*, Defendant did not object in any way when Officer Reed began searching his pockets. If Defendant did not intend to consent, Officer Reed's commencement of the search was "the time to make that clear." *Id. See Gonzalez-Ruiz*, 794 F.3d at 836. The court therefore holds that Defendant did consent to the search.

Defendant does not discuss the *voluntariness* of his consent in his motion as an argument in the alternative. Nonetheless, because counsel for Defendant broached this subject when questioning Officer Reed, the court briefly addresses it. In order to determine whether Defendant's consent to search was voluntary, the court considers the totality of the circumstances, including several key factors: "[his] age, education, and intelligence; whether he was advised of his constitutional rights; how long he was detained prior to consent; whether he consented immediately or after police made several requests; whether the police used physical coercion; and whether he was in custody. *United States v. Ruiz*, 785 F.3d 1134, 1146 (7th Cir. 2015) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

The court recognizes that Defendant had not yet been advised of his constitutional rights and, for purposes of this motion, assumes he was in custody. Under the totality of the circumstances though, the court finds that Defendant's consent was given voluntarily. While the record does not reflect Defendant's age or education, the court finds that Defendant is an adult who can understand the English language based on its observations at the suppression hearing. An important factor in this case is that Defendant had been detained for a very short period before being asked to consent to a search. Based on the dashcam footage, Officer Reed asked for consent less than two minutes after Defendant had been detained. Additionally, Officer Reed made only two requests to search. This is not a case where law enforcement repeatedly asked for consent until the suspect finally agreed. Rather, the footage suggests Officer Reed made the second request because Defendant was not able to hear the first one. Upon the second request, Defendant

consented immediately. There is no evidence of physical coercion at the time Defendant consented. While both officers had drawn their firearms when they first arrived, neither officer had his firearm out when Defendant was asked to consent to a search. After considering each of these factors, the court finds that Defendant gave consent voluntarily.

### E. Whether the officers had probable cause to conduct a warrantless arrest of Defendant

Following the search, Officer Reed placed Defendant under arrest and advised him of his constitutional rights. Because Officer Reed did not have an arrest warrant, the court must determine whether he had probable cause to effectuate the arrest: "A warrantless arrest is constitutionally permissible if supported by probable cause." *United States v. Sands*, 815 F.3d 1057, 1061-62 (7th Cir. 2015). As the *Sands* court explained, "[P]robable cause for an arrest exists 'if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime.'" *Id.* at 1062 (quoting *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013)).

The court has little trouble concluding that Officer Reed had probable cause to arrest Defendant. After obtaining consent to search, Officer Reed found marijuana and methamphetamine in Defendant's pockets. This discovery would warrant a reasonable person in believing that Defendant had violated Indiana law. *See* Ind. Code §§ 35-48-4-6.1(a) (criminalizing the possession of methamphetamine as a Level 6 felony); 35-48-4-11(a)(1) (criminalizing the possession of marijuana as a Class B misdemeanor).

11

### F. Whether Defendant has standing to contest the search of the bag

It is well established that "[w]arrantless searches are per se unreasonable under the Fourth Amendment unless they fall within 'a few specifically established and well-delineated exceptions.'" *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). The Government contends that the court need not analyze any exceptions to the warrant requirement here because Defendant lacks standing to challenge the search due to his explicit abandonment of the bag. As the Seventh Circuit explained, "A 'search' within the meaning of the Fourth Amendment occurs only where an individual has a reasonable expectation of privacy in the area searched. If such an expectation is lacking, the individual has no standing to challenge the search." *United States v. Kelly*, 772 F.3d 1072, 1083-84 (7th Cir. 2014) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). Thus, to have standing to contest the lawfulness of the search, Defendant "bears the burden of establishing that he had both a subjective and an objectively reasonable expectation of privacy." *United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014).

There is nothing unlawful about police seizing and searching abandoned property. *Abel v. United States*, 362 U.S. 217, 241 (1960). Put another way, "Abandoned property is not subject to Fourth Amendment protection. This is because . . . no person can have a reasonable expectation of privacy in an item that he has abandoned." *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000) (citations omitted). In order to show that a defendant has abandoned property, "the government must prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a reasonable

12

person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched." *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003). This is an objective test that requires the court to consider the totality of the circumstances while "pay[ing] particular attention to explicit denials of ownership and to any physical relinquishment of the property." *Basinski*, 226 F.3d at 836-37.

In *Basinski*, the Seventh Circuit identified three general types of abandonment cases: (1) a fleeing defendant who drops an object; (2) a defendant who places material in the garbage; (3) a defendant who is caught red-handed with contraband but denies ownership. *Id.* at 837. This case falls squarely in the third category. The dashcam footage plainly shows Defendant denying any ownership of the bag. After he was arrested and advised of his constitutional rights, TFO Gray and Officer Reed asked Defendant about the bag sitting on the ground next to the vehicle. Defendant claimed it was not his bag, even adding that it was already sitting on the ground when the Aurora parked. His explicit denial of ownership made it reasonable for the officers to conclude that Defendant relinquished his property interests in the bag. *See Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996) ("Bond denied owning the suitcase before the search. Bond's voluntary denial of ownership demonstrated sufficient intent of disassociation to prove abandonment.") (quotation marks and citation omitted).

The court finds that Defendant abandoned the bag and, as a result, had no reasonable expectation of privacy in it. He therefore does not have standing to challenge the search now. *See id.* ("By abandoning the suitcase at the time of the search, Bond is precluded from challenging the legality of the search because he had no legitimate

expectation of privacy in the abandoned suitcase."); *United States v. Rush*, 890 F.2d 45, 48 (7th Cir. 1989) ("Mr. Rush's denial of ownership of the suitcase is, in our view, sufficient to preclude his assertion of any legitimate expectation of privacy in the bag.").

### III. Conclusion

Therefore, Defendant's Motion to Suppress (Filing No. 17) is **DENIED**.

**SO ORDERED** this 6th day of June 2016.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.